# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA : | CRIMINAL COMPLAINT |
| v. : | |
| : | Mag. No. 22-12096 |
| ABID SYED, TARIQ DIN, : | |
| TAMER MOHAMED, ABDUL : | |
| RAUF, TAUQIR KHAN, and : | |
| NISIM DAVYDOV : | |

I, Katherine Latrenta, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Katherine Latrenta, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
April 11, 2022, in Newark, New Jersey

_____
THE HONORABLE JAMES B. CLARK, III
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

From at least as early as in or around April 2021 through in or around March 2022, in the District of New Jersey, and elsewhere, defendants

**ABID SYED,**
**TARIQ DIN,**
**TAMER MOHAMED,**
**ABDUL RAUF,**
**TAUQIR KHAN, and**
**NISIM DAVYDOV**

did knowingly and intentionally conspire and agree with others to commit offenses against the United States, that is to knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, from any person in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, item, and service, namely, COVID-19 testing, for which payment may be made in whole or in part under a Federal health care program, as defined in Title 18, United States Code, Section 24(b), namely, Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(1).

In violation of Title 18, United States Code, Section 371.

## ATTACHMENT B

I, Katherine Latrenta, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have knowledge of the facts set forth herein based on my own investigation, my conversations with other law enforcement officers and others, and my review of reports, documents, and other evidence. Because this Complaint is being submitted for a limited purpose, I have not set forth every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged. Statements attributed to individuals are provided in substance and in part. Furthermore, explanations in parentheses are based upon my knowledge and experience, the knowledge, training, and experience of law enforcement agents and officers with whom I have spoken, and the results of the investigation to date.

### Background

1. At various times relevant to this Complaint:

#### The Laboratory

a. MetPath Laboratories, Inc. ("METPATH") was a clinical laboratory located in Parsippany, New Jersey, that performed COVID testing.

b. ABID SYED ("SYED") resided in East Hanover, New Jersey, and owned and controlled METPATH.

c. TARIQ DIN a/k/a "TARIQ CHAUDHRY" ("DIN") resided in Saddle River, New Jersey, and owned and controlled METPATH.

d. ABDUL RAUF ("RAUF") resided in Edgewater, New Jersey, and was a medical biller for METPATH.

#### Lab Marketers

e. TAUQIR KAHN ("KHAN") resided in Pennington, New Jersey, and was a marketer for METPATH.

f. TAMER MOHAMED ("MOHAMED") resided in Valley Stream, New York, and was a marketer for METPATH.

3

g. Cooperating Witness-1 ("CW-1"), a co-conspirator not charged in this Complaint, was a marketer for METPATH.

h. NISIM DAVYDOV a/k/a "NISIM DAVIDOFF" ("DAVYDOV") resided in Jamaica, New York. DAVYDOV was a marketer for METPATH and owned a mobile COVID testing company.

### The Kickback Scheme

2. Law enforcement has obtained evidence showing that defendants SYED, DIN, MOHAMED, KHAN, DAVYDOV, and RAUF engaged in a scheme to pay and receive kickbacks and bribes in exchange for marketers referring COVID testing to METPATH.

3. Beginning at least as early as April 2021, SYED and DIN operated METPATH and paid marketers, including CW-1 and DAVYDOV, to refer COVID-19 tests to METPATH. SYED and DIN also paid marketers, including MOHAMED and KHAN, commissions for introducing sources of COVID-19 referrals to SYED and DIN. In exchange, SYED paid MOHAMED and KHAN commissions based on the number of tests brought to METPATH by those referral sources. Law enforcement has learned that SYED and DIN concealed some their payments to marketers by utilizing RAUF's shell company. And to conceal their ownership interests in METPATH, SYED and DIN used a nominee owner—i.e., someone other than SYED and DIN who did not in fact own or control the company—in METPATH's corporate filings.

### KHAN Introduces CW-1 to METPATH

4. According to CW-1, in early 2021, KHAN told CW-1 that CW-1 could make $20 to $25 per COVID-19 test that CW-1 sent to laboratories KHAN had relationships with. More specifically, in and around February 2021, KHAN sent CW-1 a text message containing contact information for SYED, noting that KHAN had informed SYED about CW-1's interest in the fee-for-referral arrangement proposed by KHAN.

5. Shortly thereafter, SYED and CW-1 met in person and discussed CW-1's relationship with a physician who could supply METPATH with a steady flow of orders for COVID-19 testing. SYED and CW-1 discussed SYED paying CW-1 to direct COVID specimens to METPATH. Then, in and around April 2021, SYED and CW-1

explicitly agreed that SYED would pay CW-1 $25 for every COVID test CW-1 directed to METPATH. CW-1 then began sending COVID-19 tests to METPATH.[1]

### METPATH Began Paying CW-1 Kickbacks for COVID-19 Test Referrals

6. On or about September 29, 2021, SYED paid CW-1 a $2,825 bribe by check for the COVID-19 tests that CW-1 directed to METPATH in the prior month. In a lawfully recorded conversation, at the time SYED paid CW-1, SYED stated to CW-1, "Last month's work, one-one-three patients, and I can give you the list too." CW-1 confirmed, "So how many total patients?" to which SYED responded, "113," referring to the number patients CW-1 referred to METPATH. Near the end of the same meeting, SYED once again confirmed his kickback arrangement with CW-1:

> CW-1: Okay. Wow, busy. So how many did I have?
> SYED: 113.
> CW-1: For the month?
> SYED: For the month.
> CW-1: And that's 113 times?
> SYED: 25.

Based on my training, experience, and knowledge of the investigation, I understand that, by "25," SYED was referring to the bribe amount for each patient referral, and "113" referred to the number of referrals. In this instance, SYED paid CW-1 $25 for 113 patient referrals, resulting in the $2,825 payment.

7. During this same conversation, on or about September 29, 2021, SYED acknowledged bribing others for referrals. Specifically, when CW-1 asked SYED what he typically paid out to other marketers for COVID test referrals, SYED responded, "same thing, everybody is 25 dollars." With respect to one METPATH marketer, SYED stated, "so of course I have to also pay her, same thing I'm paying you." With respect to another METPATH marketer, SYED again confirmed his practice of paying METPATH marketers $25 per referral:

> SYED: Now [unnamed marketer] is cleaning me out most, like 4,000 samples a month.
> CW-1: So how much is he making?

---

[1] In or around August 2021 CW-1 began cooperating with law enforcement. CW-1 subsequently continued to direct COVID specimens from a physician located in Brooklyn, New York, to METPATH at the direction of law enforcement.

SYED: Divide. 4,000 times $25.

SYED also acknowledged in the presence of CW-1 other fee-for-referral arrangements that SYED had with additional marketers for COVID tests.

### CW-1 Introduces MOHAMED to METPATH

8. On or about November 15, 2021, during a lawfully recorded conversation, CW-1, MOHAMED, and SYED met at METPATH to discuss a potential fee-for-referral arrangement between MOHAMED and SYED. At the outset of the meeting, CW-1 laid out the scheme to MOHAMED in the presence of SYED, stating "There's no shenanigans. [SYED] is very upfront with everything. If there's 100 patients that come in, he [SYED] gives me a list of the 100 patients, $25 per patient." MOHAMED then informed SYED that MOHAMED needed a lab to service a large client who could supply "50,000 COVID tests a month."

9. In response, SYED encouraged the arrangement, stating "[O]ur thing is whatever we say, we do it. I told [CW-1], ask him. Any marketer I tell them, okay, every 10th you will get your check, and they get their checks. And some people will tell you we'll pay you $50, $40, $30, but they don't get that much ... If we are to say okay, we pay you $25, $30, whatever, that we will do." Based on my training, experience, and knowledge of the investigation, I understand that SYED was referring to his practice of paying marketers for their referrals. MOHAMED replied to SYED, "For me with them, if I could just make a 5-dollar override and you make whatever, I don't know whatever, that's all I'd ask for essentially." Based on my training, experience, and knowledge of the investigation, I understand that an "override" referred to a smaller portion of the larger commission paid to marketers. Here, MOHAMED was requesting $5 for every commission paid to marketers whom MOHAMED brought to METPATH.

### METPATH Continued to Pay CW-1 Bribes

10. On or about November 19, 2021, SYED paid CW-1 a bribe in the amount of $3,350 for COVID specimens that CW-1 directed to METPATH. Specifically, CW-1 met SYED at METPATH for CW-1's monthly payment and lawfully recorded the conversation. At the meeting, SYED printed a patient list for CW-1 and stated, "That's 134 total, right? Yes. 134 times 25 which is 3-3-5-0." Based on my training, experience, and knowledge of the investigation, I understand that SYED was calculating the

commissions owed to CW-1 based on $25 for each of the 134 COVID-19 test referrals from CW-1. SYED then handed CW-1 a check for $3,350.

### METPATH Moved Forward with Fee-for-Referral Arrangement with MOHAMED and DAVYDOV

11. In or around October 2021 through in or around January 2022, MOHAMED had multiple telephone conversations with an apparent business associate of DAVYDOV, an individual not charged in this Complaint, who, with DAVYDOV, operated a mobile COVID testing company, about utilizing METPATH for COVID-19 testing. In or around January 2022, CW-1 contacted DAVYDOV directly via text message, and they discussed DAVYDOV utilizing METPATH.

12. On or about that same day, during a lawfully recorded conversation by CW-1, MOHAMED, SYED, DIN, and others met at METPATH to discuss a potential fee-for-referral arrangement between MOHAMED, SYED, DIN, and DAVYDOV. Prior to MOHAMED's arrival at METPATH, CW-1 informed DIN that MOHAMED wanted $30 per COVID test sent to METPATH by DAVYDOV. When MOHAMED arrived at the meeting, CW-1 related to MOHAMED that DIN was aware MOHAMED wanted $30 per COVID specimen referred by DAVYDOV. CW-1 explained to MOHAMED that CW-1 would receive 50 to 75 cents per METPATH referral sourced to another individual.

13. On or about January 14, 2022, during a lawfully recorded conversation, CW-1 met with SYED at METPATH to relay the terms proposed by DAVYDOV's associate. CW-1 explained that he/she was "looking for 20 bucks a piece." CW-1 further explained to SYED that any COVID tests referred to METPATH with respect to the instant deal would result in an "override"—i.e., a small fee off the top of the commission paid to DAVYDOV—payable to MOHAMED in exchange for MOHAMED's introduction of DAVYDOV to CW-1 and SYED.

14. Then, on or about January 20, 2022, DAVYDOV, SYED, DIN, and CW-1 participated in a WhatsApp telephone call. During the call, DAVYDOV explained that he ran a mobile COVID testing company and could supply METPATH with COVID testing samples. On the same call, DAVYDOV asked SYED and DIN what DAVYDOV would be paid per test. DIN responded by offering DAVYDOV $30 per sample so long as DAVYDOV could bring METPATH 1,000 samples per day. DAVYDOV later explained to DIN that he usually was paid $43 or $45 per sample and

asked DIN for an amount closer to $35 per sample. CW-1 suggested that DIN, DAVYDOV, and SYED work the details out later by email.

### METPATH Paid Bribes to Marketers Through RAUF's Shell Company

15. On or about March 16, 2022, in a lawfully recorded conversation, CW-1 and KHAN discussed how KHAN and CW-1 would receive their share of commissions on DAVYDOV's referrals to METPATH. KHAN explained to CW-1 that METPATH used a shell company owned by RAUF called Phoenix Business Solutions ("PBS") to pay kickbacks to marketers, stating, "whatever money you make [at METPATH] you want at PBS." Based on my training, experience, and knowledge of the investigation, I understand that KHAN was encouraging CW-1 to utilize RAUF's shell company to disguise the bribes paid to them by METPATH. Later in the same conversation, CW-1 confirmed with KHAN that METPATH should direct CW-1's commissions to PBS, asking KHAN, "So you want it going to PBS?" KHAN responded, "Yes … Yea don't worry man. So, when it goes to [RAUF] then you get your share, he gets his share, and I get my share." Based on my training, experience, and knowledge of the investigation, I understand that this comment referred to the distribution of commissions by METPATH to CW-1, KHAN, and RAUF through RAUF's shell company.

16. On or about March 24, 2022, in a lawfully recorded conversation, CW-1 and RAUF met at METPATH and discussed payments made from METPATH to marketers through PBS. RAUF explained to CW-1 that KHAN did not want a direct check from METPATH. The two also discussed METPATH paying CW-1 through PBS. Indeed, before leaving METPATH, SYED printed and signed a commission check meant for CW-1 in the amount of $1,590.00, made payable to PBS, and handed it to CW-1, who then handed it to RAUF.

17. According to Medicare billing records and records from private payors reviewed by law enforcement, METPATH submitted claims to insurance companies electronically from at least in or about 2021 through in or about the present. To date, DAVYDOV has directed 795 COVID-19 tests to METPATH, and SYED and DIN have paid CW-1 at least approximately $17,002.15 in kickbacks in exchange for CW-1 directing approximately 680 COVID specimens to METPATH.